UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

---

Kerem Yucel, Aaron Nesheim, and Timothy Evans,

Plaintiffs,

v.

Saint Paul Police Chief Axel Henry, *in his individual and official capacities*, and *John Does 1-12*;

Defendants.

Court File No. 26-cv-4889

**COMPLAINT AND DEMAND FOR A JURY TRIAL**

---

## INTRODUCTION

This case involves unconstitutional uses of force by multiple Saint Paul Police Department ("SPPD") officers against Plaintiffs, who are experienced photojournalists, during an ICE protest on November 25, 2025. Plaintiffs were clearly recognizable as journalists that day, and the actions of the SPPD officers in using less-lethal weapons and chemical irritants against Plaintiffs can only be seen as retaliation for Plaintiffs' exercise of their First Amendment rights. The conduct was not isolated to one officer, but involved multiple officers, which evidences a lack of training and supervision by SPPD regarding officers' uses of force and understanding of the First Amendment. Plaintiffs were injured and traumatized by SPPD's unconstitutional conduct and seek damages and injunctive

relief to ensure that in the future SPPD officers do not abuse journalists who are just doing their job.

## PARTIES

1. Plaintiff Kerem Yucel is an experienced photojournalist currently working for MPR News. He has been employed by MPR since 2022. Yucel has worked with Agence-France Presse, Atlas Magazine, Hurriyet Daily News, and other news organizations. Yucel's work has been featured in respected international media outlets including Time Magazine, The New York Times, and The Guardian. He has been recognized with numerous awards and accolades, including from the National Press Photographers Association, the Minnesota Society of Professional Journalists, the Turkish Photojournalist Association, and the Indigenous Journalists Association. Yucel is a Minnesota resident.

2. Plaintiff Timothy Evans is an award-winning photojournalist who resides in Minnesota. Evans works with local, national, and international news publications, including The New York Times, Reuters, NPR, Bloomberg News, The Wall Street Journal, The Washington Post, MPR News, ProPublica, and others. Evans is a Minnesota resident.

3. Plaintiff Aaron Nesheim is an experienced photojournalist currently working for The Sahan Journal, where he has been employed for the last three years. Nesheim has previously worked with The New York Times, Time Magazine, The Guardian, and The Duluth Reader. Nesheim is a Minnesota resident.

4. Defendant Axel Henry is the Chief of the Saint Paul Police Department and a Minnesota resident. At all times relevant, Defendant Henry was acting under color of state law and was chief policymaker for the Saint Paul Police Department. As Chief, Henry held supervisory authority over all involved John Does.

5. Defendant John Doe 1 is an unidentified Saint Paul Police Officer who threatened Kerem Yucel with pepper spray on November 25, 2025. On information and belief, John Doe 1 is a Minnesota resident. Defendants solely possess the information necessary to identify John Doe 1. At all times relevant, John Doe 1 was acting under color of state law. John Doe 1 is sued in his individual capacity.

6. Defendant John Doe 2 is an unidentified Saint Paul Police Officer who pepper sprayed Kerem Yucel on November 25, 2025. On information and belief, John Doe 2 is a Minnesota resident. Defendants solely possess the information necessary to identify John Doe 2. At all times relevant, John Doe 2 was acting under color of state law. John Doe 2 is sued in his individual capacity.

7. Defendant John Doe 3 is an unidentified Saint Paul Police Officer who pepper sprayed Kerem Yucel on November 25, 2025. On information and belief, John Doe 3 is a Minnesota resident. Defendants solely possess the information necessary to identify John Doe 3. At all times relevant, John Doe 3 was acting under color of state law. John Doe 3 is sued in his individual capacity.

8. Defendant John Doe 4 is an unidentified Saint Paul Police Officer who targeted Timothy Evans and shot Kerem Yucel with a crowd control weapon on November 25, 2025. On information and belief, John Doe 4 is a Minnesota resident. Defendants solely

possess the information necessary to identify John Doe 4. At all times relevant, John Doe 4 was acting under color of state law. John Doe 4 is sued in his individual capacity.

9. Defendant John Doe 5 is an unidentified Saint Paul Police Officer who shot Yucel with a crowd control weapon on November 25, 2025. On information and belief, John Doe 5 is a Minnesota resident. Defendants solely possess the information necessary to identify John Doe 5. At all times relevant, John Doe 5 was acting under color of state law. John Doe 5 is sued in his individual capacity.

10. Defendant John Doe 6 is an unidentified Saint Paul Police Officer who shot Timothy Evans with a crowd control weapon on November 25, 2025. On information and belief, John Doe 6 is a Minnesota resident. Defendants solely possess the information necessary to identify John Doe 6. At all times relevant, John Doe 6 was acting under color of state law. John Doe 6 is sued in his individual capacity.

11. Defendant John Doe 7 is an unidentified Saint Paul Police Officer who shot Aaron Nesheim with a crowd control weapon on November 25, 2025. On information and belief, John Doe 7 is a Minnesota resident. Defendants solely possess the information necessary to identify John Doe 7. At all times relevant, John Doe 7 was acting under color of state law. John Doe 7 is sued in his individual capacity.

12. Defendant John Doe 8 is a Saint Paul Police Officer who supervised John Does 1-7 in his capacity as Incident Commander during the Rose Avenue incident and at all times was acting under color of state law, within the course and scope of his official duties. On information and belief, John Doe 8 is a Minnesota resident. Defendants solely possess the information necessary to identify John Doe 8.

13. Defendant John Doe 9 is a Saint Paul Police Officer who supervised John Does 1-7 in his capacity as Mobile Field Force ("MFF") Commander during the Rose Avenue incident and at all times was acting under color of state law, within the course and scope of his official duties. On information and belief, John Doe 9 is a Minnesota resident. Defendants solely possess the information necessary to identify John Doe 9.

14. Defendants John Does 10-12 are Saint Paul Police Officers who supervised John Does 1-7 and at all times were acting under color of state law, within the course and scope of their official duties. On information and belief, John Does 10-12 are Minnesota residents. Defendants solely possess the information necessary to identify John Does 10-12.

## JURISDICTION AND VENUE

15. Plaintiffs' claims arise under 42 U.S.C. § 1983, the Fourteenth Amendment to the United States Constitution, and the First and Fourth Amendments, as incorporated against the States, their agencies, and their municipal divisions through the Fourteenth Amendment.

16. Jurisdiction is proper in this Court according to 28 U.S.C. § 1331 because Plaintiffs' claims arise under the United States Constitution and federal law.

17. This Court has supplemental jurisdiction over the included Minnesota state law claims pursuant to 28 U.S.C. § 1367.

18. Venue is proper in this district under 28 U.S.C. § 1391, as Defendants reside in this district, and the events or omissions giving rise to the claims set forth herein occurred in this district.

19. Plaintiffs demand a trial by jury pursuant to Fed. R. Civ. P. 38(b).

## FACTUAL ALLEGATIONS

20. On the afternoon of November 25, 2025, federal Immigration and Customs Enforcement ("ICE") officers conducted an immigration raid on the 600-block of Rose Avenue East in Saint Paul, Minnesota.

21. Because of the notorious nature of ICE raids being conducted in Chicago, Minneapolis, and elsewhere, numerous observers and protesters were expected to and did arrive at the enforcement action to observe and protest ICE activity.

22. Plaintiff Nesheim arrived at the scene shortly after 10:00 a.m. Nesheim was dressed and equipped such that it was clear he was a member of the press. When he first arrived at Rose Avenue on November 25, and throughout his time at the protest, Nesheim was wearing a press lanyard that identified him as a journalist with The Sahan Journal. He was using two large professional cameras strapped across his back and shoulders. For safety, Nesheim was wearing a full-face gas mask. Nesheim photographed the scene for more than two hours. At no time did he demonstrate any conduct that would have suggested he was a protester, let alone engage in any hostile or threatening conduct toward law enforcement. He simply photographed the event using his large professional camera equipment. Law enforcement had the opportunity to observe, and did observe, Nesheim

operating in his professional capacity throughout the morning and early afternoon, and by noon he was a familiar journalistic presence photographing the event.

23. Plaintiffs Evans and Yucel arrived at the protest at around noon. By noon, SPPD was already present, supporting ICE agents who were attempting to detain an individual inside a home on Rose Avenue.

24. Evans was dressed and equipped such that it would be clear he was a member of the press. When he first arrived at Rose Avenue on November 25, Evans was wearing a press lanyard and was carrying two large professional cameras with large lenses. After a few initial minutes of photographing the event, Evans returned to his car and put on a ballistic vest with a large “PRESS” sticker on its front. Evans photographed the protesters and law enforcement for roughly an hour. At no time did he demonstrate any conduct that would have suggested he was a protester, let alone engage in any hostile or threatening conduct toward law enforcement. He simply photographed the event using his large professional camera equipment.

25. As the below photograph shows, Evans was easily recognizable as a journalist:




26. Ultimately, Evans found Yucel and they stood together for safety as they photographed the scene.

27. Like Evans, Yucel was dressed and equipped such that it would be clear he was a member of the press. When he first arrived at Rose Avenue on November 25, Yucel was wearing an MPR press lanyard clearly visible on his chest and was carrying two large professional cameras and a camera bag. Yucel photographed the protesters and law enforcement for roughly an hour. At no time did he demonstrate any conduct that would have suggested he was a protester, let alone engage in any hostile or threatening conduct toward law enforcement. He simply photographed the event using his large professional camera equipment.

28. Sometime after noon, ICE left the scene with detainees, and people began moving more freely on sidewalks and across the street from the house that had been the target of the ICE raid.

29. SPPD began walking backward, away from the house, apparently to begin their departure from the scene. Protesters marched in front of the retreating officers, shouting at them to leave.

30. Around this time, Yucel was taking photographs when John Doe 1, an out-of-control SPPD officer, began pepper spraying a nearby protester in clear retaliation for their First Amendment protected conduct. Some of this spray came into Yucel's face, but he was able to continue photographing. The protester was not engaged in any violent or threatening activity, and some SPPD officers pulled that officer back and tried to calm him down.

31. In this photograph, John Doe 1 can be seen aiming his pepper spray canister directly at Yucel at close range, despite the fact that Yucel was obviously a journalist:



32. A few minutes later, Yucel saw an SPPD officer push a protester to the ground. The protester was using a cane and clearly presented no threat to anyone.

33. Officers continued their slow retreat until they reached the intersection of Payne Avenue and Rose Avenue, at which point they again deployed pepper spray and other less-lethal munitions toward the crowd.

34. Shortly thereafter, John Doe 2 pepper sprayed Yucel directly in the face and mouth as Yucel photographed him. Yucel was just a few feet away from John Doe 2 when this happened, and the officer provided no warning before firing. Yucel inhaled and swallowed a large amount of the chemical spray. He was wearing glasses and continued

photographing. After the initial cloud began to clear, Yucel could still see the officer through his camera's viewfinder, and the officer continued spraying Yucel.

35. This picture shows John Doe 2 aiming his canister at Yucel shortly before firing it:



36. This image shows John Doe 2 firing the spray at Yucel:



37. Around five minutes later, Yucel was on the other side of the road. He saw and photographed police spraying a protester at very close range. Immediately afterward, another SPPD officer – John Doe 3 – used chemical spray against Yucel again.

38. Another officer, John Doe 4 watched as Plaintiffs continued to photograph SPPD pepper spraying protesters, as can be seen in the below-photograph, taken by Evans, in which John Doe 4 can be seen sitting in the white SUV, staring directly at Plaintiffs as they photograph the scene:




39. John Doe 4 shot directly at Evans' feet with pepper balls about 10 seconds after Evans photographed him. Evans was holding up a camera and photographing while standing to the side of the protesters and on the sidewalk, where he had moved for safety after pepper spray was deployed, as can be seen in the below photograph:




40. Evans was still holding his camera up when John Doe 4 shot at him. Pepper balls exploded at the ground before Evans' feet, as can be seen in the below photograph:




41. As seen in the photograph below, John Doe 4 looked directly at Evans when he fired his weapon toward Evans. This conduct evinces clear intent on the officer's part to target a member of the press when Evans was visible and identifiable as a photojournalist, posed no threat, and was intentionally situating himself away from the protesters.



42. Shortly thereafter, John Doe 5 targeted Yucel with pepper balls, as seen in the below photographs, which show John Doe 5 deliberately targeting and firing at Yucel and a pepper ball bouncing off of Yucel after impacting his neck area:





43. Several munitions fired by John Doe 5 struck Yucel's shoulder. One struck him in the throat, causing him to stumble and lose his balance. He was struck additional times. At the time, Yucel was clearly identifiable as a journalist and was obviously engaged in photographing the event. He was carrying two professional cameras, and his press badges marked PRESS and MPR News were clearly visible on his chest. Despite this, John Doe 5 aimed his weapon and fired pepper balls directly at Yucel's chest, shoulders, and throat. These actions by John Doe 5 were clearly retaliatory. Yucel was obviously a journalist, obviously photographing the event, and obviously uninvolved in any protest activity, let alone anything threatening or violent that would justify the use of the pepper balls against him. Yucel did not hear any warning or specific command prior to the use of

chemical weapons against him, or before and before officers fired pepper balls at him in clear retaliation for his obvious and protected First Amendment conduct.

44. Moments later, John Doe 4 also shot Yucel, using what appears to be a pepper ball gun equipped with a laser sight:



45. One or more of John Does 4-7 then tossed tear gas canisters directly at the feet of Plaintiffs as they clustered together, with no protesters standing nearby. The use of this tear gas, like the use of the pepper balls, was clearly meant as retaliation for Plaintiffs' exercise of their First Amendment rights. One of these tear gas canisters struck Yucel in his foot and enveloped him in a cloud of gas. Chemical irritants covered Yucel's face and clothing.

46. Shortly thereafter, John Doe 6 shot Plaintiff Evans in the torso with pepper balls or other crowd control weapons. At the time, Evans was clearly identifiable as a journalist and was obviously engaged in photographing the protest. In fact, he was struck just below the large, visible "PRESS" decal on his vest. The pepper ball or other weapon exploded up into Evans' jacket, trapped between his ballistic vest and his coat. At the time, Evans was standing on the sidewalk, off to the side at least 15 feet away from the officers, and clearly out of the line of sight to the distant protesters. The officers could not have been shooting at anyone other than Nesheim, Yucel and Evans, who were all clustered within several feet of one another. No one else was within 10 feet of the group of journalists, as can be seen in the photograph below, taken at the moment Evans was shot in the stomach:



47. Minutes after Evans was shot, John Doe 7 shot Plaintiff Nesheim in the head with a pepper ball or other less-lethal munition. At the time, Nesheim was clearly identifiable as a journalist and had been engaged in photographing the protest for more than two hours. The pepper ball or other weapon impacted the side of his head. Within twenty minutes, a welt began to form on his temple where the less-lethal projectile had hit. At the time he was hit, Nesheim was standing on the sidewalk, off to the side at least 15 feet away from the officers, and clearly out of the line of sight to the distant protesters.

48. The actions of John Does 4-7, blatantly shooting Plaintiffs with pepper balls while Plaintiffs photographed SPPD, were clearly in retaliation for Plaintiffs' exercise of their First Amendment rights as journalists. Plaintiffs were clustered together away from

protestors, it was daylight, all three were wearing visible press indicia including lanyards and large press decals, and all three were simply (and obviously) photographing the event with large, professional-grade cameras. As no protesters posing a threat were located near Plaintiffs when they were struck, one after the other, with less-lethal munitions, it is clear that Plaintiffs were the sole target of the force exercised despite being clearly identifiable as press and professionally documenting the events. The John Does' attack of Evans, Yucel, and Nesheim was obvious retaliation for their First Amendment conduct.

49. For example, the below photograph shows white residue where pepper ball or other less-lethal munitions impacted Evans' torso, directly beneath his large PRESS decal and adjacent to the media credential hanging from his lanyard:




50. No Plaintiff ever physically touched a police officer, blocked a police officer, police vehicle, or police movement, argued with, yelled at, threatened, or provoked police officers. Plaintiffs did not encourage or provoke protesters. Their interactions with people at the scene were limited to ordinary journalistic activity, such as asking protestors for their names for a caption or obtaining information for reporting. The only objects in their hands or on their shoulders were professional cameras and photography equipment. All Plaintiffs had press identifications on their chests that were clearly visible throughout the incident.

No officer told them, "Press, move back," or gave them any other direct instruction or command. In short, it was impossible for Defendants to mistake Plaintiffs for protesters, and Plaintiffs conducted themselves professionally throughout the entire incident. The John Does assaulted Plaintiffs *because* they were members of the press.

51. As can be seen in the below-photograph taken after Yucel was shot with the pepper balls, it would have been obvious to the John Doe officers that Yucel was a photojournalist and not a protester:



52. After the John Does' retaliatory attacks, chemical agents covered Yucel's head, neck, face and hands. He struggled to breathe. Evans, aided by Good Samaritans, sat Yucel on the sidewalk and helped get his jacket off. They poured water on his face to rinse off the chemicals, as can be seen in the below photograph, which also shows the impact of one of the pepper balls on Yucel's right shoulder:



53. Yucel swallowed chemical irritants when SPPD shot him. His chest and lungs burned from the chemicals, and he felt a deep panic at his inability to breathe. Any time he opened his mouth, his chest burned. His hands and eyes burned from the chemicals. For three weeks after the assault, his lips were swollen and numb.

54. Evans also had chemicals all over his jacket, vest, and hands. After he removed his personal protective equipment, including his gas mask, he began uncontrollably coughing and gagging from the chemicals. He realized at this point that a welt and bruise were beginning to form on his stomach where he had been shot with a munition, as seen in the below photograph:



55. Someone called an ambulance for Yucel because it was so agonizing for him to breathe. The ambulance arrived, and EMTs loaded Yucel into it. He was so covered with chemical irritants, however, that the EMTs began to cough uncontrollably and were forced to place Yucel's jacket and gear in a garbage bag to prevent the chemicals from affecting the crew. Below is a picture of Yucel, in agony, after he had been loaded into the ambulance:



56. When Yucel arrived at Regions Hospital, staff told him they could not admit him into the main hospital because he was so soaked with chemical irritants that it was unsafe for staff and other patients. Hospital staff had to put Yucel in a room near the entrance to the Emergency Room where they provided initial treatment. When Yucel's wife

and two young sons came to visit him in the hospital that evening, he could not hug them because he was still covered in chemical irritant residue.

57. Nesheim was also covered in chemical irritant after being struck. As he drove home with a fellow journalist along Highway 94, Nesheim's eyes burned. Nesheim drove with the vehicle's windows rolled down despite the cold weather because he was so covered in chemical irritants. When he arrived home, he took a shower to try to remove the pepper ball residue still trapped in his hair. Showering reactivated the chemicals, and Nesheim experienced burning around his face and neck. For about three hours after his assault, Nesheim continued to experience burning from the chemicals. For the next three days, he experienced headaches and pain at the impact site.

58. The day following the protest, Evans went to urgent care to address the injury to his stomach. It was swollen, painful, and a bruise had formed. He was prescribed a steroid to control the swelling, but still a hard, painful lump formed under the skin where he had been hit that took a month to resolve.

59. During SPPD's assaults of Plaintiffs catalogued above, numerous other officers – John Does 8-12 – observed, directed, and ratified these unconstitutional acts. John Does 8-12 stood in a supervisory position over John Does 1-7 but did nothing to intervene or correct their unconstitutional conduct.

60. Per SPPD policy 438.18: "The senior commander of the Special Operations Unit (SOU) will be assigned as the event incident commander. The SOU senior commander may designate a MFF commander to assist with tactical operations. The incident commander is responsible for scene operations during MFF activations. The incident

commander will work with the MFF commander to coordinate activities through the incident command system. The MFF commander must determine and control MFF tactical operations." As the designated Incident Commander at Rose Avenue, John Doe 8 was "responsible for scene operations" during the incident. The unconstitutional conduct by John Does 1-7 reflects and was caused by the supervisory failures of John Doe 8, who failed to properly train, instruct, and direct John Does 1-7 to forego the unconstitutional conduct toward Plaintiffs that occurred on November 25, 2025. As the Incident Commander, John Doe 8 was aware of the misconduct of John Does 1-7 and failed to intervene to correct or stop that misconduct.

61. Further, per SPPD Policy 438.18: "The MFF commander is responsible to restore order in the most reasonable manner possible, using sound tactics and equipment necessary to protect life and personal safety, deter criminal behavior, and prevent property damage. MFF responses will employ a layered approach based on SOU preparation, training, and tactics (438.18)." As the designated MFF Commander at Rose Avenue, John Doe 9 was "responsible to restore order in the most reasonable manner possible." Clearly, as shown above, John Doe 9 failed in this responsibility, as there was nothing reasonable about the repeated assaults on Plaintiffs by John Does 1-7. The unconstitutional conduct by John Does 1-7 reflects and was caused by the supervisory failures of John Doe 9, who failed to properly train, instruct, and direct John Does 1-7 to forego the unconstitutional conduct toward Plaintiffs that occurred on November 25, 2025. As the MFF Commander, John Doe 9 was aware of the misconduct of John Does 1-7 and failed to intervene to correct or stop that misconduct.

62. SPPD Policy 438.19.6(a) provides that SPPD officers may use pepper spray, "only against specific individuals who are engaged in specific acts of serious unlawful conduct or who are actively resisting arrest." John Does 1-3 violated this policy when they pepper sprayed Yucel directly, and at close range, knowing he was a member of the press engaged in newsgathering activities, and was clearly and obviously not an "individual engaged in specific acts of unlawful conduct or who [was] actively resisting arrest."

63. SPPD Policy 438.19.6(b) provides: "Officers shall use the minimum amount of the chemical agent necessary to overcome the subject's resistance." John Does 2-3 violated this policy when they pepper sprayed Yucel directly in the face and mouth at close range, with extended blasts of spray, when he was not "resisting" at all but merely taking photographs.

64. SPPD Policy 438.19.6(c) provides: "Officers must monitor the subject and pay particular attention to the subject's ability to breathe following the application of a chemical agent." John Does 1-12 ignored Yucel after dousing him in chemical agents, and paid no attention to his inability to breathe – struggles that culminated with his emergency removal from the scene in an ambulance.

65. According to SPPD Policy 246.02: "Before deployment of PepperBall, the PepperBall operator should, when practical to do so, give clear instructions to the subject(s) similar but not limited or specific to: "SAINT PAUL POLICE DROP THE WEAPON, DROP THE WEAPON AND GET DOWN ON THE GROUND. IF YOU DO NOT DROP THE WEAPON, I MAY USE FORCE AGAINST YOU." Officers must give the subject a

reasonable opportunity to voluntarily comply when safe to do so." SPPD officers did not provide any such instruction to Plaintiffs before firing pepper balls at them.

66. Further, SPPD Policy 246.02 states: "Deployment of PepperBall in a manner intended to impact a subject is . . . Only authorized in response to resistance or aggression that meets the definition of aggressive or aggravated aggressive resistance." John Does 4-7 violated this policy when they fired pepper ball weapons directly at Plaintiffs, and in a manner intended to impact Plaintiffs, despite the fact that Plaintiffs were not engaged in "resistance or aggression that meets the definition of aggressive or aggravated aggressive resistance," but were instead clearly identifiable as members of the press and were photographing protesters and police at the moment they were shot.

67. SPPD Policy 246.02 prohibits the use of pepper ball weapons against "the head, neck or spine," unless a deadly force situation exists. John Doe 5 violated this policy when he targeted and shot Yucel with pepper ball munitions in the neck. John Doe 7 violated this policy when he shot Nesheim in the head with a pepper ball munition.

68. Finally, SPPD Policy 438.19.8 states:

> A. The media have a First Amendment right to cover public activity, including the right to record video or film, livestream, photograph, or use other mediums.
>
> B. The media must not be restricted to an identified area, must be permitted to observe and must be permitted close enough access to view the crowd event and any arrests. An onsite supervisor/incident commander may identify an area where media may choose to assemble.
>
> C. Officers will not arrest members of the media unless they are physically obstructing lawful efforts to disperse the crowd, or efforts to arrest participants, or engaged in criminal activity.

D. The media must not be targeted for dispersal or enforcement action because of their media status.

E. Even after a dispersal order has been given, clearly identified media must be permitted to carry out their professional duties unless their presence would unduly interfere with the enforcement action.

69. John Does 1-7 violated 438.19.8 by, among other things, deliberately targeting Plaintiffs for enforcement action because of their media status and by interfering with Plaintiffs' ability to continue to carry out their journalistic duties even though Plaintiffs did not "unduly interfere" with any "enforcement action" at Rose Avenue on November 25.

70. During the Rose Avenue incident, SPPD also used chemical irritants and less-lethal weapons against other non-violent protesters and observers at Rose Avenue in violation of the First Amendment.

71. For example, Minnesota State Representative Athena Hollins, who represents the district where the Rose Avenue incident occurred and was present for the protest, was hit by chemical irritants while observing the protest and law enforcement response. Hollins stated: "I'm trying to understand why a lot of the chemical irritants that were used were deployed by our St. Paul Police Department, especially given that we are supposedly a sanctuary city that was not supposed to be engaging in these activities or supporting ICE and federal agents in what they are doing."

72. Yeng Her of the non-profit organization Immigrant Defense Network stated: "community members gathered on Rose Avenue to peacefully observe and protect their

neighbors during an ICE raid. And instead, they were met with excessive force, intimidation and violence."

73. Community member Amber Mathwig was present at the protest. She has stated: "[St. Paul Police] showed up fully masked; they showed up ready to start something."

74. St. Paul City Council Member Hwa Jeong Kim was pepper sprayed, struck with a less-lethal munition, and tear-gassed by police at the Rose Avenue incident. She told reporters: "The way that our police officers showed up today was abhorrent."

75. Then-Mayor Melvin Carter stated publicly after the incident: "We just saw chemical munitions and things like that that were used, and one of the things I share with the crowd is, I have questions same as everybody else does about what precipitated that and why."

76. Carter further stated: "The police department has already begun conducting a full review of every use of force that was done today." This purportedly included reviewing all the relevant body camera footage.

77. Defendant Henry was present at the protest, monitoring and watching the Rose Avenue incident unfold in real time and issuing commands related to the response, including directing officers' response to the protest and ordering that Rose Street be closed to traffic.

78. Defendant Henry issued a video statement the day of the incident in which he confirmed: "I responded personally to [the protest]."[1] He later stated in an interview that SPPD's response to the Rose Avenue protest: "didn't go the way we wanted it to." Henry stated in an interview that "uses of force happened when we were trying to leave." On December 11, 2025, Henry stated that SPPD would release "all body camera footage [of the Rose Street SPPD uses of force]. . . as soon as I can." As of the filing of this Complaint, however, no such footage has been released and, on information and belief, no officers have been disciplined by SPPD for their policy violations.

79. In sum, Defendant Henry was present at the Rose Avenue incident, monitoring events as they occurred, issuing commands and personally supervising John Does 1-12 in their activities that day, and thus aware of and knowingly acquiesced in SPPD's numerous violations of the above-referenced use of force policies with respect to Plaintiffs and others. Despite his awareness that the SPPD officers he supervised were engaged in the unconstitutional conduct against Plaintiffs and others described herein, Defendant Henry failed to intervene or take any steps to stop the misconduct described herein.

80. In March 2026, Saint Paul's Police Civilian Internal Affairs Review Commission requested that the City hire an independent investigator to review SPPD's conduct during the Rose Avenue protest. The Mayor rejected this request.

[1] https://www.youtube.com/watch?v=XaahonhdrsQ

81. No SPPD officer or City employee has contacted Plaintiffs, despite the fact that the unconstitutional uses of force against them, and Plaintiff Yucel's ambulance trip to Regions Hospital, were widely covered by the local press. Any body-camera footage reviewed documenting the use of force against Plaintiffs will show that SPPD's use of force was plainly and obviously unjustified and unconstitutional. And yet, on information and belief, no SPPD officer has been disciplined in relation to this event.

82. In addition to the serious physical injuries Plaintiff Yucel suffered, he has been deeply mentally and emotionally traumatized by the incident. He has resorted to using medication to sleep. He has attended therapy to assist with his PTSD and process the trauma of SPPD's assault. His memory has been affected, and his professional life negatively impacted by the assault.

83. In the months that followed the incident, Yucel experienced significant sleep disruption, early waking, concentration and memory problems, tinnitus/noise sensitivity, anxiety and hypervigilance, and difficulty returning to his normal exercise and daily routines.

84. Yucel went through a lengthy course of therapy and worked specifically on PTSD and the trauma connected to the events of November 25, 2025. Memory, sleep, hypervigilance, loss of confidence, work, and family relationships repeatedly became subjects of this therapy.

85. The professional consequences to Yucel have been especially significant. ICE operations did not end on November 25. They continued and escalated into one of the most consequential ongoing news stories in the city and community where Yucel lives and

works. Yet in the period immediately after the incident, Yucel's newsroom understandably wanted to protect him and allow him to recover from the physical and mental trauma of November 25, and he was not sent back into the field.

86. Yucel had spent years covering breaking news, protests, and difficult situations. Being a senior photojournalist was not simply a title. It represented years of experience and a major part of Yucel's identity. In fact, Yucel emigrated to the United States through the EB-1 "extraordinary ability" visa category based on his professional work and achievements in photojournalism. At exactly the time when a historically important story was developing in his own community — a story for which his experience as a breaking-news photojournalist was particularly relevant — he was no longer in the field. He felt that he had suddenly gone from being an experienced photojournalist to being the photographer who had been knocked down, injured, and could no longer do his job. That perception severely damaged his professional confidence.

87. The impact on Yucel therefore did not end with the physical assault on November 25. In the months that followed, he struggled with self-doubt: whether he was still the same photographer in the field, whether other people trusted him to do the work, and whether he trusted himself. He began to feel isolated at work. Communication became more difficult. Workplace interactions and assignment issues affected him more intensely because his sense of professional security and confidence had already been damaged. These issues repeatedly came up during therapy. Photojournalism, and particularly field and breaking-news work, had been central to Yucel's identity for many years. After November 25, he felt not just physically injured. He felt that an important part of the professional

identity he had built over many years had been taken away from him. That loss of confidence affected his workplace relationships, his family relationships, and his relationship with himself.

88. The impact on Yucel's family was particularly painful. One important reason Yucel came to the United States with his family was the belief that he could work more safely as a journalist and provide a safer future for his children. On November 25, Yucel was injured by police while visibly doing his job as a journalist, and photographs and video publicly documented what happened. When Yucel's wife and sons came to the hospital, he could not hug them because he was still contaminated with chemical irritant residue. His family's fear and the damage to their sense of safety affected Yucel deeply.

89. Evans has also suffered emotional distress as a result of his assault. In the weeks immediately following the incident in question, Evans experienced recurring insomnia, intrusive thoughts, and nightmares related to his assault. These symptoms continue to occur periodically. He has also experienced irregular bouts of depression and anger brought on by thoughts of the incident, which, at times, impact his personal life and relationship with his partner. Evans was motivated to undergo therapy months after his assault to manage ongoing stress from the experience. The assault has left him feeling elevated stress and nervousness while working in unrest situations, which has impacted the quality of his work.

90. Nesheim has also suffered significant mental and emotional distress as a result of his assault. The assault left him feeling elevated stress and panic while working in unrest situations. In the months since his assault, Nesheim's symptoms have only

worsened. Even when covering peaceful assignments, like the first day of school, Nesheim has experienced panic and other trauma symptoms. On October 1, 2026, Nesheim checked himself into Fairview Southdale's EmPATH unit for mental health crisis treatment. He has recently received a diagnosis of PTSD and begun out-patient therapy. He is now using his savings to take unpaid leave from his position at The Sahan Journal and is in the application process for Minnesota's Paid Leave program in order to take necessary time to recover. He anticipates taking six weeks of leave from his position during which time he will miss out on career opportunities and lose wages even assuming he is granted medical leave coverage by the State.

91. Plaintiffs are deeply experienced photojournalists. Collectively, they have covered dozens, if not hundreds, of protests and other incidents of public unrest in both locally and internationally.

92. Yucel emigrated to the United States around nine years ago. He came here in significant part believing that he could work more safely as a journalist and give his children a safer future. Being injured here by local police while he was clearly working as a journalist therefore affected him at a very deep level. Yucel has covered many protests and incidents of civil unrest around the world, including in countries run by hostile, repressive governments such as Syria, Turkey, Nigeria, and similar countries in Central Africa and Central Asia. Yucel had *never* been attacked by law enforcement or government authorities until the SPPD assaulted him in November 2025.

93. The officers who pepper sprayed and shot Plaintiffs did so with malice. Knowledge of Plaintiffs' status as journalists was obvious and unavoidable given the clear

indicia of their press status: press badges, lanyards, and professional camera equipment. Officers targeted Plaintiffs in the head and neck using precision laser-sighted weapons. Throughout the protest, Plaintiffs were peaceful and engaged only in constitutionally protected journalistic activity.

**COUNT I**
**42 U.S.C. § 1983 – *CITY OF CANTON***
**FAILURE TO TRAIN AND SUPERVISE**
***DEFENDANT HENRY (Official Capacity)***

94. Plaintiffs restate and reallege all previous paragraphs of this Complaint.

95. SPPD knew that it was necessary to train and supervise its employees regarding their responsibilities under the First Amendment to avoid violating the constitutional rights of journalists and protesters.

96. SPPD failed to properly train and supervise its employees regarding the First Amendment, crowd control, and protest response.

97. SPPD was deliberately indifferent to the need to provide its employees with training on the First Amendment, crowd control, and protest response.

98. SPPD's deliberately indifferent failure to train and supervise was the moving force behind Plaintiff's injuries.

99. As a direct and proximate result of SPPD's unlawful conduct, Plaintiffs endured physical injuries, pain and suffering, and mental and emotional distress.

## COUNT II:
## FIRST AND FOURTEENTH AMENDMENTS
## FREEDOM OF SPEECH AND THE PRESS, 42 U.S.C. § 1983
## *DEFENDANTS JOHN DOES 1-12*

100. Plaintiffs restate and reallege all previous paragraphs of this Complaint.

101. Plaintiffs engaged in constitutionally protected acts of journalism on November 25, 2025.

102. John Does 1-12, at all times acting under color of law, used unlawful use of force to curb Plaintiffs' exercise of their First Amendment rights.

103. The actions of John Does 1-12 were willful, malicious and in violation of the known rights of Plaintiffs.

104. Alternatively, John Does 1-12 acted with reckless disregard for the constitutional rights of Plaintiffs.

105. Plaintiffs suffered physical injury, great pain and suffering, and emotional distress as a direct and proximate result of John Does 1-12's violations of their constitutional rights.

106. Punitive damages in an amount to be determined by the jury are available against John Does 1-12 and are hereby claimed as a matter of federal common law under *Smith v. Wade*, 461 U.S. 30 (1983), and as such, are not subject to the pleading requirements or the differing standard of proof set forth in Minn. Stat. § 549.20.

107. Defendants are jointly and severally liable to Plaintiffs.

## COUNT III:
## FIRST AND FOURTEENTH AMENDMENTS RETALIATION, 42 U.S.C. § 1983
## *DEFENDANTS JOHN DOES 1-7*

108. Plaintiffs restate and reallege all previous paragraphs of this Complaint.

109. Plaintiffs engaged in constitutionally protected acts of journalism on November 25, 2025. Plaintiffs will continue to do so in the future.

110. John Does 1-7's use of crowd control weapons against Plaintiffs, for no legitimate law enforcement reason, was retaliation for Plaintiffs exercise of their First Amendment rights.

111. The actions of John Does 1-7 were willful, malicious and in violation of the known rights of Plaintiffs.

112. Alternatively, John Does 1-7 acted with reckless and deliberate indifference to the constitutional rights of Plaintiffs.

113. Plaintiffs reasonably fear the continued use of excessive force against them if they continue to engage in constitutionally protected activity.

114. The acts of John Does 1-7 would chill a person of reasonable firmness from continuing to engage in a constitutionally protected activity. These acts did, in fact, chill Plaintiffs from continuing to engage in constitutionally protected journalism.

115. The injuries Plaintiffs suffered due to John Does 1-7's use of excessive force actually prevented Plaintiffs from exercising their First Amendment rights.

116. Plaintiffs suffered physical injury, great pain and suffering, and emotional distress as a direct and proximate result of John Does 1-7's violations of their constitutional rights.

117. Punitive damages in an amount to be determined by the jury are available against John Does 1-7 and are hereby claimed as a matter of federal common law under *Smith v. Wade*, 461 U.S. 30 (1983), and as such, are not subject to the pleading requirements or the differing standard of proof set forth in Minn. Stat. § 549.20.

118. Defendants are jointly and severally liable to Plaintiffs.

**COUNT IV:**
**FOURTH AND FOURTEENTH AMENDMENT**
**UNREASONABLE FORCE, 42 U.S.C. § 1983**
***DEFENDANTS JOHN DOES 1-7***

119. Plaintiffs restate and reallege all previous paragraphs of this Complaint.

120. By the actions described above, John Does 1-7 violated and deprived Plaintiffs of their clearly established and well-settled right to be free from excessive force under the Fourth and Fourteenth Amendments to the United States Constitution.

121. John Does 1-7 were acting under color of law when they violated Plaintiffs' Fourth and Fourteenth Amendment rights.

122. John Does 1-7's actions were willful, malicious and in violation of the known rights of Plaintiffs.

123. Alternatively, John Does 1-7 acted with reckless and deliberate indifference to Plaintiffs' constitutional rights.

124. John Does 1-7 committed these acts without forewarning and, as a result, his acts were objectively unreasonable.

125. Plaintiffs did not pose a threat to any of law enforcement officers or agents or any other person.

126. Plaintiffs suffered physical injury, great pain and suffering, and emotional distress as a direct and proximate result of John Does 1-7's violations of their constitutional rights.

127. Punitive damages in an amount to be determined by the jury are available against John Does 1-7 and are hereby claimed as a matter of federal common law under *Smith v. Wade*, 461 U.S. 30 (1983), and as such, are not subject to the pleading requirements or the differing standard of proof set forth in Minn. Stat. § 549.20.

128. Defendants are jointly and severally liable to Plaintiffs.

**COUNT V:**
**42 U.S.C. § 1983 - SUPERVISORY LIABILITY**
***DEFENDANT HENRY (Individual Capacity)***

129. Plaintiffs restate and reallege all previous paragraphs of this Complaint.

130. At all times relevant, Defendant Henry had supervisory responsibility and authority over John Does 1-12.

131. Henry's failure to train and supervise his supervisees, employees and agents, including John Does 1-12, and failure to issue corrective instructions after violations were brought to light, caused John Does 1-12 to violate the First Amendment rights of Plaintiff.

132. Henry's failure to supervise and train their supervisees, employees and agents, including John Does 1-12, with respect to the First Amendment rights of Plaintiffs,

including a failure to investigate and discipline officers for First Amendment violations, amounts to reckless and deliberate indifference to the rights of Plaintiffs.

133. SPPD's need for more supervision or training with respect to the First Amendment was so obvious, and the inadequacy of the training and supervision so likely to result in the violation of constitutional rights, that Defendant Henry demonstrated his reckless and deliberate indifference to the need for such training and supervision in failing to provide it.

134. Henry's failure to train and supervise his supervisees, employees and agents, including John Does 1-12, and failure to issue corrective instructions after violations were brought to light, caused John Does 1-12 to violate the Fourth Amendment rights of Plaintiffs.

135. Henry's failure to supervise and train his supervisees, employees and agents, including John Does 1-12, with respect to the Fourth Amendment rights of Plaintiffs, including a failure to investigate and discipline officers for Fourth Amendment violations, amounts to reckless and deliberate indifference to the rights of Plaintiffs.

136. Alternatively, Henry's failure to provide SPPD with adequate supervision and training with respect to the First and Fourth Amendments constituted gross negligence.

137. Plaintiffs suffered physical injury, great pain and suffering, and emotional trauma and distress as a direct and proximate result of Henry's failure to adequately supervise and train their employees and agents, including John Does 1-12.

138. Punitive damages in an amount to be determined by the jury are available against Henry and are hereby claimed as a matter of federal common law under *Smith v.*

*Wade*, 461 U.S. 30 (1983), and as such, are not subject to the pleading requirements or the differing standard of proof set forth in Minn. Stat. § 549.20.

139. Defendants are jointly and severally liable to Plaintiffs.

**<u>COUNT VI:</u>**
**42 U.S.C. § 1983 – SUPERVISORY LIABILITY**
***DEFENDANTS JOHN DOES 8-12***

140. Plaintiffs restate and reallege all previous paragraphs of this Complaint.

141. Defendants John Does 8-12 at all times material hereto were members of the SPPD with supervisory responsibility over John Does 1-7.

142. By the actions described above, John Does 8-12, acting under color of state law, observed or intended the use of excessive force set forth above, and none intervened to halt it or take other corrective action.

143. By the actions described above, John Does 8-12, acting under color of state law, observed or intended the violation of Plaintiffs' First Amendment rights, and none intervened to halt it or take corrective action.

144. Each of John Does 8-12 observed, and had the realistic opportunity to prevent, John Does 1-7's use of unlawful levels of force against Plaintiffs while Plaintiffs were physically separated from the protest activity in the area and engaged in the constitutionally protected journalistic activity. Yet John Does 8-12 failed to intervene and prevent the unlawful assaults.

145. John Does 8-12 issued orders allowing John Does 1-7 to violate Plaintiffs' First Amendment rights.

146. John Does 8-12 issued orders allowing John Does 1-7 to use excessive force against Plaintiffs in violation of the Fourth Amendment.

147. Plaintiffs suffered physical injury, great pain and suffering, and emotional trauma and distress as a direct and proximate result of the acts and omissions of John Does 8-12.

148. Punitive damages in an amount to be determined by the jury are available against John Does 8-12 and are hereby claimed as a matter of federal common law under *Smith v. Wade*, 461 U.S. 30 (1983), and as such, are not subject to the pleading requirements or the differing standard of proof set forth in Minn. Stat. § 549.20.

149. Defendants are jointly and severally liable to Plaintiffs.

**COUNT VII:**
**FAILURE TO INTERVENE, 42 U.S.C. § 1983**
***ALL DEFENDANTS***

150. Plaintiffs restate and reallege all previous paragraphs of this Complaint.

151. During the constitutional violations described in this Complaint, including the firing of crowd control weapons at Plaintiffs while they exercised their First Amendment rights, Defendants stood by without intervening to prevent the misconduct.

152. Defendants had a duty to intervene to prevent the constitutional harms and personal injuries described in this Complaint.

153. Defendants had the authority to intervene to prevent the constitutional harms and personal injuries described in this Complaint.

154. Defendants had a reasonable opportunity to prevent the constitutional harms and personal injuries described in this Complaint but failed to do so.

155. Defendants acted with reckless and deliberate indifference to the constitutional rights of Plaintiffs when they failed to intervene to prevent the constitutional harms and personal injuries described in this Complaint.

156. The misconduct described in this Complaint was undertaken under color of state law, and Defendants acted at all times under the color of state law when they failed to intervene to prevent the constitutional harms and personal injuries described in this Complaint.

157. Punitive damages in an amount to be determined by the jury are available against Defendants and are hereby claimed as a matter of federal common law under *Smith v. Wade*, 461 U.S. 30 (1983), and as such, are not subject to the pleading requirements or the differing standard of proof set forth in Minn. Stat. § 549.20.

158. Defendants are jointly and severally liable to Plaintiffs.

## COUNT VIII:
## CIVIL BATTERY
## *DEFENDANTS JOHN DOES 1-7*

159. Plaintiffs restate and reallege all previous paragraphs of this Complaint.

160. Defendants John Does 1-7 intentionally caused harmful contact by using crowd control weapons against Plaintiffs..

161. Defendants John Does 1-7 acted with malice, as it is defined in the context of official immunity, because they intentionally committed acts that they had reason to believe were legally prohibited. Specifically, Defendants intentionally targeted Plaintiffs with crowd control weapons even though Plaintiffs were not engaged in any violent,

dangerous, or criminal activity, but were rather peaceably and demonstrably engaged in the constitutionally protected act of documenting the ICE protests on November 25, 2025.

**COUNT IX:**
**CIVIL ASSAULT**
***DEFENDANTS JOHN DOES 1-7***

162. Plaintiffs restate and reallege all previous paragraphs of this Complaint.

163. Defendants John Does 1-7 created fear of imminent harm when they fired crowd control weapons into the crowd near Plaintiff, threatening and assaulting protesters and members of the press, brandishing weapons directly at Plaintiffs and threatening them.

164. Defendants John Does 1-7 intentionally created fear of imminent harm to disperse the crowd, regardless of whether individuals, such as members of the press, were legally allowed to remain in the area.

165. Defendants John Does 1-7 had the apparent ability to cause harm to Plaintiffs because they were physically accosting, threatening, and assaulting surrounding individuals, in a display of force intentionally directed towards those individuals as well as towards Plaintiffs.

166. Defendants John Does 1-7 deliberately targeted Plaintiffs because of Plaintiffs' protected First Amendment conduct and despite Plaintiffs' peaceful and non-threatening presence.

167. Defendants John Does 1-7 had the apparent ability to cause harm to Plaintiffs because they possessed weapons, including chemical irritants, which could and were used to inflict harm on surrounding individuals.

168. Plaintiffs reasonably feared imminent harm because they had witnessed the indiscriminate use of force on other surrounding peaceable individuals and members of the press.

169. Plaintiffs reasonably feared imminent harm because Defendants John Does 1-7 were approaching and threatening them with weapons, including chemical irritants.

170. Defendants John Does 1-7 acted with malice, as it is defined in the context of official immunity, because they intentionally committed acts that they had reason to believe were legally prohibited. Specifically, Defendants John Does 1-7 intentionally created fear of imminent harm in Plaintiffs even though Plaintiffs were not engaged in any violent, dangerous or criminal activity, but were rather peaceably and demonstrably engaged in the constitutionally protected act of documenting the ICE protests on November 25, 2025.

**COUNT X:**
**MINNESOTA CONSTITUTION – LIBERTY OF THE PRESS**
***ALL DEFENDANTS***

171. Plaintiffs restate and reallege all previous paragraphs of this Complaint.

172. Minnesota's Constitution provides: "The liberty of the press shall forever remain inviolate, and all persons may freely speak, write and publish their sentiments on all subjects, being responsible for the abuse of such right."

173. Defendants, by their conduct described herein, violated Plaintiffs' "liberty of the press" as protected by the Minnesota Constitution.

174. Defendants' violent conduct toward Plaintiffs was in retaliation for Plaintiffs' exercise of their rights as journalists under the Minnesota Constitution.

175. Plaintiffs were injured by Defendants' violations of their rights as journalists under the Minnesota Constitution, and Defendants' conduct chilled the future exercise of Plaintiffs' constitutional rights as journalists under the Minnesota Constitution.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs pray for relief as follows:

A. A declaration that Defendants' conduct violated the First, Fourth, and Fourteenth Amendments of the U.S. Constitution;

B. Damages compensating Plaintiffs for their injuries, pain and suffering, and emotional distress, including but not limited to compensatory, pecuniary, and medical expense damages;

C. An injunction prohibiting Defendants from engaging in further unconstitutional conduct against Plaintiffs;

D. Punitive damages;

E. An award of pre-judgment interest;

F. An award of attorneys' fees and costs pursuant to 42 U.S.C. § 1988;

G. An award of such other relief as the Court deems equitable and just.

## **JURY DEMAND**

Plaintiffs demand a trial by jury of all issues triable pursuant to Rule 38 of the Federal Rules of Civil Procedure.

Dated: November 17, 2026

*/s/ Kevin C. Riach*
Kevin C. Riach (#0389277)
Charlotte L. Colantti (#0506801)
**RIACH LAW PLLC**
125 Main St. SE, Suite 339
Minneapolis, MN 55414
Telephone: (612) 203-8555
kevin@riachlaw.com
charlotte@riachlaw.com
***ATTORNEYS FOR PLAINTIFFS***